Good morning, Your Honors, and may it please the Court, I am Patrick Downs, Counsel for Appellants. Wait just a second, I think we're waiting for someone else. Is everyone on? Okay, I'm sorry. Thank you, Your Honor. May I proceed? Yes, please introduce yourself again. I'm sorry I interrupted you. That's fine. Good morning, my name is Patrick Downs, I'm Counsel for Appellants, and I would like to reserve three minutes for rebuttal. All right, please watch your time, Counsel. Thank you. In this case, we suggest or submit that discharge should be denied for two reasons, and this would be governed by Ninth Circuit Authority, N. Ray Retz. We've raised two issues on appeal. I'm going to take the second issue first, and that is Section 727.85, which requires the debtor to adequately explain the disposition of his assets. Here, we have a $250,000 cash withdrawal that is banished. It's undisputed, this is the largest withdrawal in the record. We learn at trial that it's supposedly a cashier's check, but before that, at deposition, we asked the debtor, what was this for? He says, he doesn't know what the check is for, but his account does. That's right, that's what he says at trial. At deposition, in the deposition transcripts in the record, he says, okay, if you look at page 85, I see a withdrawal of $250,000 from February 4, 2016. Answer, yes. Question, can you tell me what it's for? Answer, I know, and I disclosed it to a trustee, but I can't remember right now. Question, was it for your benefit? Answer, I know what it is, but I don't, it's not, I can't recollect right now. And then, Your Honor, as you point out at trial, he says, my accountant will tell you. And then the accountant says, for advertising, drawn through a cashier's check, doesn't know who it was written to, but not fake, was not improperly drawn. That's right, and the problem with that is, we don't know where it went. Well, but the problem with that is, and it's very specific, you have a bankruptcy judge who's sitting right there at the hearing, who knows what the situation is, and who is able to go through this. What is my standard of review as it relates to what the bankruptcy judge decides? On this issue and the other, where we won, it's clear error. Okay, so in this case, on clear error, you had your shot to give the bankruptcy judge all the arguments you're giving to me. I looked exactly at what he said at trial. I saw what he said in the deposition, but really, that's just, if you will, argumentative as to what he really was. The ledger shows withdrawals of $100,000 and $101,422 at about the same time for the same thing. So, based on that, I'm saying to myself, golly, why is that clear error? Well, it's clear error because the cashier's check and the $250,000 withdrawal are never addressed at all. Well, but just a minute, it is addressed. They said it was fine. No, no, no. Bankruptcy judge said it's okay. No, nowhere does the memorandum opinion by the bankruptcy judge address this entry. Nowhere. It's not addressed. There's a statement, and it's as simple as that. What are your pleadings about the cashier's check? Well, the pleadings are generally about the disposition of cash, and the pretrial order is talking about $4 million in cash that's disappeared. Right, and so at the time, one really wondered what the specific identifiable missing asset was. Was it the $4 million? That's what seemed to be in the complaint. The court went through the records and said no problem in my book. Well, except it skipped the largest entry, and $250,000 is clearly material. Look, this debtor had over five meetings with the U.S. trustees, so the books were not clear. And sure, perhaps the debtor was able to explain some of them, but not this one. And a cashier's check is inherently suspicious. Somebody got it. But again, just a minute. We had two similar withdrawals later, one for $100,000, another for $101,422. They're about the same time. They're for the same reason, advertising promotion. And the bankruptcy judge, who has a chance to go through the records and listen to what happened at the trial, says no problem. And I, on clear air, am supposed to say you're just out to lunch. Well, we would at least want an answer on the $250,000. Well, he said no problem. But without addressing the $250,000, the largest withdrawal. Those other withdrawals were explained. One went to the Bank of Nigeria. We know the answer there. But $250,000 vanished. And that's not fair. That's not an honest debtor who had eight months to tell us where the money was. It doesn't answer that. And, you know, the Inouye Retz case talks about you can't just—in that case, it was even better for debtor because there, the trustee was given records, 28,000 pages of documents, and presumably somewhere in there would have explained it. Here, there's not any explanation for where that money is. Well, I'm some surprised you started with that issue. Well, I wanted to do it to get it over with because it's faster. And so I'll submit that 727A5, for a $250,000 amount, where the debtor clearly had notice, he was asked about it in his deposition, you've got to be able to explain where it went. Who got it? That's a simple question. Even the BAP's authority holds that. Moving on to the— But the BAP affirmed the bankruptcy court on that. For sure. But the authority they cite is helpful for the 727A5 position. I understand what you're saying. All right. Okay. Now, on the false oath, the trial court's finding there was not clearly erroneous. And I'm sure your honors have read, but at page 20 of the trial court's opinion, EER 92, the court wrote, the court finds the customer and lead list were grossly undervalued. There is no bright-line rule for how much specificity is required, but a debtor is required to be as particular as reasonable in valuing assets under the circumstances, citing this court's Cusanovi-Klein case. Here, Schultz, who's the debtor, could have chosen the $1 million valuation he used to promote his mastermind webinar to his customers, but instead he chose a $778.60 value from Precious New. Now, Precious is supposedly a Nigerian in the same business as the parties here. It is unreasonable for Schultz to have chosen the lowest valuation, given that he had touted the list was worth $1 million. Whereas here a debtor has specialized knowledge of a specific asset or an industry, the debtor cannot intentionally lowball the value of the asset to conceal its true value. Again, we're on a standard review question here, aren't we? We could be, yes. And so was this decision clearly erroneous? And the answer is no. That's why I wondered why you started with the second issue. Well, okay. I did because I just wanted to get it in the record because we believe we're right on that. Now, here— I understand, but if I'm going to support you here on a clearly erroneous evaluation, I'm going to have a tough time understanding why you're absolutely right on the second issue. Okay. Well, I'll talk more about the first issue. The court was right about that because we have a statement by the debtor saying the list is worth $1 million. And that is at ER 306. He says he built an email list valued at $1 million. This is the only asset that's worth anything in this bankruptcy. And if you look at Excerpt of Record 210, you'll see there's three assets listed. One is an Internet domain. Ultimatefreedomevents.com has a zero— Do you understand why the BAP came out the other way on this? Yeah. Well, I don't understand. I think— Well, you understand what they said? Yes. They said— Okay, address that. I think that's your tough issue. In the hands of the trustee, this asset wasn't worth anything more than $778. That's what they said. That's right. They said there's no evidence in the record which would give any idea that this was worth any more than $778.60 in the hands of the trustee. And that's not true. Well, what's the clear error? The clear error—well, the clear error the BAP made or the support for the trial court's decision assessing the credibility of the debtor is that she determined he lied. And she determined he lied because this asset made, among other things—she has several reasons, but one is post-bankruptcy it made $138,000. It's undisputed by both parties that if you're not using your own email list, you have to pay 50% of the sales to a third party. Was there ever a value which the bankruptcy judge agreed with? She didn't find—well, maybe Mr. Shugart. She said, you know, he sounds right. There's a $12,000 valuation he gives, but she says this is grossly undervalued. And Ninth Circuit cases talk about how, you know, if there's a range, you're supposed to disclose the range or pick a midpoint value or pick something. But what he did was he lied and picked a low-ball value. And what the Inouye Retz case says is a debtor in bankruptcy proceedings, the debtor had a duty to share full information with the trustee. Well, that would include telling the trustee, I think this is worth a million dollars. I'm just trying to focus you. It seems to me that the BAP was saying there is no value in the record upon which we can concentrate except the $778.60. And because there's no value in there that gives us any different than that, all arrests give values, but nobody said that it was this value or that value. Therefore, that was an abuse of discretion for the bankruptcy judge to do what they did. How do you respond to that? That's not true because if the bankruptcy, if the trustee had known it was worth $100,000 to Schultz, it could have negotiated with Schultz or the debtor and held on to it. And if it had held on to it, it would have gotten $70,000, getting 50% of the proceeds from it. The value of the list is how often the list is used. And so it could change, but you're going to get 50% of the sales from the list. He got $148,000 within eight months of filing the bankruptcy petition. That's real money. That's $70,000 to the owner of that list. If Mr. Schultz, under custom and practice in this industry, if he had to pay to use the list, it would have cost him $50,000 to use it. And in the first instance, he has a duty to share full information with the trustee. If he's an honest debtor, he has to disclose candidly full everything. So he should have disclosed, you know what, I think this list is worth a lot of money to me. And that would have allowed the trustee to negotiate with him. Instead, he picked some made-up value that the court doesn't believe has any basis at all in how he arrived at it. And so in a sense, the BAP is flipping the burden here on the wrong party. He has to offer a credible valuation, and he doesn't. And in response, we pull out his own valuation of $1 million. So why isn't that their value? That's his admission. It's supported by facts. There were almost $6 million in sales in this case. What difference do we owe to the BAP altogether? None. None on this. She made a factual finding that Mr. Schultz was not credible. He deliberately undervalued it. And no deference is afforded on that. The court got it right. You mean the bankruptcy judge? Yeah, the bankruptcy judge got it right. Yeah, you've got his own admission. Well, the bankruptcy judge, all you're suggesting is that it isn't clearly erroneous what the bankruptcy judge did. Isn't that what you're saying? That's all I have to show here. We also think that the facts support that, and that other judges would come to this where you have a debtor saying my list is worth $1 million, and then he turns around and tells the trustee it's only worth $778. That's not fair. That's not an honest debtor. That's not full disclosure. Do you have to prevail on both of your arguments? No. No, Your Honor. So if you prevail on this one, knowing that you last argued, you don't have the $250,000 one. The court will never reach it, most likely. That's right. If there are no further questions. Do you have your remaining time for rebuttal, counsel? Yes, Your Honor. Thank you. Thank you. You've got to turn your mic on. It's still muted. We can't hear you. Can you hear me now? Now we can. Okay. I apologize. First of all, the point that the appellant misses on the million-dollar valuation is that that was never a valuation as to what the list should be sold for. That was in the context that the debtor gave it in a webinar selling an Internet product where people could create their own list. It was simply showing them what he has earned on it by a list that he built. But again, you're missing the point here. What's the standard of review for the bankruptcy judge? It's clear to hear. So the bankruptcy judge, hearing all this, six months earlier in a webinar, it would be a million bucks, referred to what he could earn on an ongoing business, valued, made about $6 million in sales in 2015 and 2016. Other folks could get 50% of the sales from a marketing campaign. The business made $138,000 from April 2017 to May 2018. Shugart says a worse list than that was worth $12,000. How can I say that's clear error to say that he ought not be discharged? It's clear error because the valuations need to be based upon what the trustee could sell the property for. Well, that's exactly right. We've got all these values in there. Six months earlier, he says it's worth a million for him. Then we've got these other things that I've reported to you. It seems to me that it gives a clear error for the poor bankruptcy court to say, hey, this is not right. Well, the bankruptcy court has to consider the context that the value is given. Well, I understand the context. But if the business can make $138,000 after, if Shugart can say there's a $12,000 to be made on a worse list, and he says it's worth a million before, I'm having a tough time understanding how I can say that the trustee, that there's no confident or plausible evidence that the customer was worth more in the hands of the trustee. I'm having a tough time understanding clear error on that. Well, the list is basically selling a brand. It's selling the debtor, Jason, Jordan Schultz. Any third party that's selling it will not have Jordan Schultz involved. So? So, clear error. The bottom line is he's not involved, but a trustee with those same particular things is not going to make more than $778. When he says six months earlier he could have made a million, the business makes $138,000 afterwards, I'm having a tough time how that was clear error. The bankruptcy, in the BAP's mind, it seems to me they missed the standard of review. Well, I think they pointed out that, first of all, even if there was a false oath, he still was mentally disabled during this period of time, and so he wouldn't have had the fraudulent intent or the knowledge based on the court's own findings that in the other cases of items that were left from his petition. Well, that seems a little difficult in that it seems like this is a little bit different situation than those that dealt with, say, the check. The check was one thing, one could have forgotten it, one could have done something. This was the whole case here. Well, the whole case actually should rest more than anything else, his mental state of mind when these actions took place. And when he filled out his petition, the trial court, the bankruptcy court found that he didn't have the capability to form the intent and the knowledge for the Bitcoin issues and for the Rolex, omitted Rolex issues. Well, he corrected the errors for those, didn't he? Well, we did when we found out it was wrong, but there's nothing that we have seen. But you didn't correct the valuation ever. To him, excuse me, to the trustee or to a third party. And the fact that he used the list afterwards and earned $138,000, that was the list being used by himself. It wasn't being used by a third party. So that's not a good judge of what the trustee could sell it for. And the idea that the trustee could rent it out to a third party, it misses the point because the trustee actually exhibit 37 at supplemental excerpts of the record. I think it's 699 in the notice of abandonment shows the reason the trustee abandoned this was not because of its value, but because there was an ongoing litigation over its ownership. And secondly, because it involved confidential and private information. So what it would sell for afterwards would not have affected the trustee's decision because she told us in this exhibit what her motivations were and what impact the value had on her as to whether or not she abandoned it. And the judge found that he intentionally wanted the trustee to abandon it so he could keep it. But that's counterintuitive because the plaintiffs had a lawsuit against him for the ownership of it. If he values it at a low value, they can come in and buy it from the trustee for $782. So that's a counterintuitive. If he's that Machiavellian in his middle capacity, he wasn't. I mean, I think the evidence is overwhelming that this young man has a hard time just finding his way around through life during this period of time, which was a two-week period or one-week period between the filing of these two bankruptcies. Otherwise, other than this period, he was okay? No, he's not okay in other times. But this was a particularly bad time because of the stress element, which aggravates the PTSD, the disassociative disorder, the multiple faces or parts of self that manifest themselves. And he's operating an enormously successful business. At different times, he is. But, of course, he has a staff that's assisting him and helping him. But apparently this is such an insidious disease, especially with the three of them combining, that it can render him, as he said somewhat accurately, I suspect, based on the therapist that testified, he was like a zombie. He couldn't concentrate. He couldn't think. He didn't have clarity. The judge found he couldn't connect the dots. I mean, it's a horrible case of what a disabled human being is going through in this situation. But it does ebb and flow. But during these critical periods of time, there's no indication that he was anything but mentally disabled. Well, let's think about that. There was a time when the trustee valued the asset low and abandoned it. And he made no offer to try to even get it. Then there was another time when he filed a district court lawsuit to acquire ownership of the lists and claim their value high at trial. How do you explain that? I'm sorry. I misunderstood, Your Honor. The debtor never claimed that. That was what the plaintiffs had claimed. Well, wasn't there a district court lawsuit filed? There was. There was a district court lawsuit. And didn't he acquire the ownership of the lists and claim their value high at trial? No, there's never been a trial. This was interrupted by the bankruptcy. There's never been a finding of any claim in the district court. Okay, I misread that then. No, the point is that the plaintiffs had a lawsuit to acquire ownership. And when the trustees sent them a notice of abandonment, they could get it for $782,000. They made no attempt to get it, which undermines their position that it had a high value on it. All right. As I understand it, I'll retract. Thank you. Additionally, the plaintiffs are alleging that the trustee could have rented out the lawsuit to a third party and just argued that a few minutes ago. The chapter 7 is a liquidation. It's not to reestablish a business and reorganize and continue operating a business. To rent lists out would be flying in the face of the purpose of a chapter 7. That would not make any sense. The trustee has no product to sell. Any third party would have the same problems with this lawsuit for fighting for ownership of the list and the confidential issues there. There's no relationship. That's kind of a key factor here is that in this affiliate marketing niche that they're in, relationship of the list owner to his members of the list is paramount. That's one of the contextual questions that the judge missed so that the people respond on the list to the owner of the list with the relationship to a third party. It's basically spam. It's just going to go in their spam folders. It's not going to be a money-making proposition, and certainly there's nobody ever established a value anywhere in here other than what was the petition value for these lists. The biggest problem you have with me is that even if the people on the list were 100 times more likely to buy from Jordan than others might have been who might buy from others like the trustee and sell the items on the list, even at 100 times more likely to buy from Jordan, the fair market value would be $10,000, and it's valued at $778. I mean, I'm having a tough time on a clear air review to get to that. Even at 100 times more likely, which is his language, to buy from him than from others, in the hands of the trustee, if I divide that by 100 times, they'd still get $10,000. Yeah, the point is, but there was no evidence of that. There was no evidence of what they would buy for. Well, but just a minute. Six months earlier he said it was a million, and he did say that they're 100 times more likely to want to buy a high from me than they are from others. He was not selling the list in the webinar, Your Honor. He was selling the type of program that they could use to with people that have relationships with him. Okay. I think we just lost Judge Rollins on my screen here. We lost her a time ago. We'll have to wait a minute. She's always wanting to check out. I do see that we have lost Judge Rollins, and I'm on the lookout for her when she pops back in. Okay. Okay. Okay. Okay. Okay. Are you still there, Richard? Yes, Judge. I'm on the phone with Judge Rollins, and right now we're trying to get her on by phone back into this call, Judge. Okay. Okay. You got it. Okay. I'll get back to you. Okay. I was going to say, otherwise, we could appoint my good friend honorable Corman, the presiding judge and just go to the end of this. I'll stipulate if it will speed the court's calendar. Because you've only 229 left, and then we can take a few comments from the other side and have Judge Rollins read the transcript. I'm happy to do that if the court prefers that. I'm good with it. No, no, we ought to wait for her, I guess. I have no authority to do what I'm trying to do. I'm just trying to help you lawyers so you don't have to sit on the phone and wait. He just knows we need the help. No, you don't need the help. Just got a rogue judge here who's trying to do what he can to make sure you don't lose a lot of time. We appreciate it. Can you all hear me? Yes, Your Honor. I apologize. I'm having some technical difficulties with my home Wi-Fi. I apologize. But you can proceed. I've heard everything. Thank you, Your Honor. The last point I'd like to make is that the trial judge found that Jordan low-balled the list to cause the trustee to abandon it. And I think that needs to be pointed out, that that was just a clear mistake, that the reasons the trustee abandoned it is clearly stated in Exhibit 37, FCR number 699, that had nothing to do with the value of the item. It was because of the ownership litigation and because of the privacy and the confidential. So that was a clear mistake that the judge made, and I think that's a big factor of what the BAP looked at to determine that this case should be reversed on that cause of action. Also, the context item is critical in that this is a niche of affiliate marketing where lists and relationship of the owner of the list with the list is critical, that the $1 million figure was at a different time, a different place, and it wasn't offering the list for sale. It was offering a program where they could build their own list, as Jordan had done over time with customers or people listening to his webinar that he established a relationship with. And it's that relationship, even though Judge Smith did bring up a good point that maybe the actual amount that someone could earn from it in the future might be more, the burden is on the plaintiff, excuse me, the plaintiff to establish the burden approved in a dischargeability case. But it's only in a preponderance of the evidence, isn't it? Well, it is, but in a discharge case, the evidence is interpreted strictly against the plaintiff and liberally for the defendant. I understand that. So in this case, I think the BAP arrived at the good, the best decision evaluating the evidence, whether it was in interpreting strictly for the plaintiff that the value of the list or the false oath issue should be decided in favor of the debtor  Thank you, Your Honor. Counsel rebuttal. Yes, briefly, Your Honor. Back to the NRA Rets case that here, the ninth circuit has said previously, the opportunity to obtain a fresh start is conditioned upon truthful disclosure that are here needed to be truthful. And he wasn't the suggestion that the abandonments that the trustee was fully informed of everything here is not true. Under current value on SCR 699 supplemental excerpt of record under current value, the trustee lists the valuation given by the debtor of $348 for one list and $430 for the other. That's not noticed to the trustee. Furthermore, the ninth circuit has said in NRA Rets, lack of injury by creditors is irrelevant in purposes of denying a discharge. And even though the transfer there didn't harm the estate, the fact that the debtor lied about it was a basis to deny the discharge similarity here. In terms of Mr. Schultz's mental state, the court found he was highly intelligent, sophisticated. And as, as has been observed, there were multiple amendments here. He could have changed his mind. Anytime he fixed something, the trial court let him off the hook. He's had moments of lucidity. He is very intelligent. He's still making money. He could have corrected it. We still would have challenged it, but he could have corrected. He doesn't do that. The mental, the mental state is a red herring here. He thinks the $778. Correct. And it's not. In addition, you know, the valuation to Mr. Schultz personally was a fact that should have been disclosed to the trustee. The trustee would have been in a better position to negotiate with him. And, you know, had that negotiation not worked out, the trustee would have owned it. And Mr. Schultz would have been forced to pay at least 50%, which is $70, but you know, your honors observation about a $10,000 evaluation. It's very close to Mr. Shoe guards. That's material. So for all of those reasons, there are sufficient facts to, to support the trial court's determination. And, and that her denial of discharge was not clearly erroneous. All right. Thank you. Counsel. Thank you to both counsel for your helpful arguments. The case just needed is. The minute for decision by the court that completes our calendar for the morning. And we will be in recess until 9 30 AM tomorrow morning. Thank you. This court starts at recess until nine 30, tomorrow morning.
judges: Rawlinson, N.R. Smith, Korman